IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 08-cv-02521-PAB-KLM

FREDERIC E. FATELL,

    Plaintiff,

v.

STEWART TITLE GUARANTEE COMPANY,

    Defendant.
_____

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**
_____

This title insurance case comes before the Court on defendant Stewart Title Guarantee Company's motion to dismiss [Docket No. 3]. The Court's jurisdiction is based on diversity of citizenship and an amount in controversy exceeding $75,000, in accordance with 28 U.S.C. § 1332(a).

**I. BACKGROUND**

    **A. Factual Background**

The following facts are taken from plaintiff Frederic Fatell's Complaint and are presumed to be true for purposes of this motion. In September 1996, Mr. Fatell entered into a contract with Sundial Village, LLC ("Sundial Village") to purchase an undeveloped residential lot in the Sundial Subdivision in Dolores County, Colorado. The contract required Sundial Village, who is not a party to this case, to furnish a current commitment for title insurance. Sundial Village engaged Telluride Mountain Title Company – a trade

name under which defendant Stewart Title conducts business in Colorado – to provide the required title insurance policy.

The sale between Sundial Village and Mr. Fatell closed on October 28, 1996. Sundial Village executed a warranty deed which described the property as follows:

> Lot 14, Sundial P.U.D., Located within the Dolores Placer M.S. 336, Pioneer Mining District, Sections 1 and 2, Township 39 North, Range 11 West, N.M.P.M., according to the plat filed of record in the office of the Clerk and Recorder in Plat Book 2 at Page 92, County of Dolores, State of Colorado, and more specifically described on Exhibit "A" attached and incorporated by this reference, and together with any and all Minerals therein.
>
> as known by street and number as: Lot 14, SUNDIAL VILLAGE.

Compl. ¶ 13.

All of the land encompassed by the description above ("Lot 14") was once part of the public domain. At least some portion of Lot 14 was conveyed to private hands in 1891 as part of the Dolores Placer Mining Claim patent ("Dolores Patent"), United States Patent No. 17109. The patent was properly recorded and is available in the Dolores County Clerk and Recorder's Office.[1] The patent encompasses a large parcel of land in which Lot 14 of the Sundial Subdivision was believed to fall. In reality, a

---

[1] Plaintiff attached a copy of the recorded patent to his response to the motion to dismiss. *See* Resp. to Mot. to Dismiss [Docket No. 14] at 22-24. Because the document is central to plaintiff's claims, its authenticity is not in question, and it is referred to and quoted in the Complaint, I may consider the document without converting defendant's Rule 12(b)(6) motion into a motion for summary judgment. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007); *cf.* Fed. R. Civ. P. 12(d). The patent in its current form, however, is not easily deciphered, preventing the Court from ascertaining its full effect. Therefore, the Court relies on this document at this stage of the litigation only to the extent that it supports or clarifies the presumptively true averments in plaintiff's Complaint. The Court makes no findings at this point regarding the patent's full and ultimate effect.

portion of the property identified in the description of Lot 14 was not conveyed from the United States in the Dolores Patent.

The Dolores Patent uses a metes-and-bounds-type survey description to delineate the property. The description first charts five straight survey lines which meet at identified angles and combine to form an elongated, sideways pentagon. The patent then "expressly excepts and excludes" from this basic shape, portions of land identified as lode mining claims and millsite claims. *See* Resp. to Mot. to Dismiss [Docket No. 14] ("Pl.'s Resp.") at 23. Therefore, those who trace their title in land to the Dolores Patent cannot assert proper title over the land which rests inside these lode mining and millsite claims.

One of the parcels excluded from the Dolores Patent was known as the Cape Verde Lode or Cape Verd Mining Claim ("Cape Verde Claim"). *See* Compl. ¶ 23; Pl.'s Resp. at 4, 23. The portion of land within the Cape Verde Claim is currently owned by the United States and is under the control of the U.S. Forest Service. Approximately seventy percent of the property purportedly conveyed to Mr. Fatell and described as Lot 14 of the Sundial Subdivision falls within the historical boundaries of the Cape Verde Claim. Therefore, the putative owner of Lot 14 lacks good title to that portion of the property.[2]

As a result, when Mr. Fatell transferred his interest in Lot 14 to Michael and Jean Danzer in 2005, the title he conveyed was defective. The Danzers discovered the

---

[2] It is not clear from the record before the Court who first incorrectly amalgamated the land within the Cape Verde Claim and the land conveyed as part of the Dolores Patent into what is now known as Lot 14, but all indications are that the error pre-dated Mr. Fatell.

3

defect in 2007 and sought relief from Mr. Fatell for alleged breaches of covenants and warranties.  Following the settlement of those claims, Mr. Fatell filed a claim with defendant Stewart Title under the title insurance provided in connection with the 1996 transfer from Sundial Village.  Stewart Title eventually denied Mr. Fatell's claim.  As a result, Mr. Fatell initiated the present suit.

### B.  The Title Policy

Beginning in October 1996, Stewart Title issued various iterations of a title commitment and a standard American Land Title Association (ALTA ) title policy covering Lot 14, culminating with the January 10, 1997 issuance of Owner's Title Policy #O-9993-1003672 ("Title Policy") which lists Mr. Fatell as the named insured.[3]  *See* Pl.'s Resp. at 18.  The first section of the Title Policy establishes the baseline coverage by explaining that it "insures . . . against loss or damage . . . sustained or incurred by the insured by reason of: (1) Title to the estate or interest described in Schedule A being vested other than as stated therein; (2) Any defect in or lien or encumbrance on the title; (3) Unmarketability of the Title . . . ."  Compl. ¶ 17; Pl.'s Resp. at 14.  Schedule A, as referenced above in the statement of coverage, describes the covered property in terms nearly identical to those within the deed:

> Lot 14, Sundial P.U.D., Located within the Dolores Placer M.S. 336, Pioneer Mining District, Sections 1 and 2, Township 39 North, Range 11

---

[3] In connection with the present motion to dismiss, the parties have provided the Court with a copy of the Title Policy [Docket Nos. 13-2, 14].  Like the attached copy of the Dolores Patent, the authenticity of this document is not in question, it is central to plaintiff's claims, and it is referred to and quoted in the Complaint.  Therefore, I also may consult the copy of the Title Policy without converting defendant's Rule 12(b)(6) motion into a motion for summary judgment.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007); *cf.* Fed. R. Civ. P. 12(d).

> West, N.M.P.M., according to the plat filed of record in the office of the Clerk and Recorder in Plat Book 2 at Page 92, County of Dolores, State of Colorado, and more specifically described on Exhibit "A" attached and incorporated by this reference, and together with any and all Minerals therein.

Pl.'s Resp. at 18.[4]

Directly following the statement of coverage, the Title Policy lists various exclusions from that coverage. For example, the policy does not insure losses, damages, costs, attorneys' fees or expenses which arise by reason of certain laws and regulations or certain defects, liens, encumbrances, and adverse claims. *See* Pl.'s Resp. at 14. The Title Policy also contains a standard ALTA Schedule B, listing various general and special exceptions from coverage, followed by an endorsement deleting the first four general exceptions.[5]

Defendant's motion to dismiss relies on two of the exceptions in Schedule B, one general and one special, as the basis for dismissing plaintiff's breach of contract claim. The first is paragraph 5, a general exception which states:

> This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of . . . [u]npatented mining claims; reservations or exceptions in patents, or an act authorizing the issuance thereof; water rights, claims or title to water.

---

[4] The "Exhibit A" cited in the property description refers to a legal description prepared by a professional land surveyor which is attached to the Title Policy. *See* Pl.'s Resp. at 19.

[5] General exceptions address those "problems that underwriters intend to except in the majority of policies issued in a particular region . . . ." Joyce Palomar, Title Insurance Law § 7:1 (2008). Special exceptions, on the other hand, "are typed individually into title insurance policies to except from coverage particular title defects, liens, and encumbrances which the title company found affected the specific property interest being insured when the company searched the title." Joyce Palomar, Title Insurance Law § 7:1 (2008).

5

Pl.'s Resp. at 20.  In its motion to dismiss, defendant only invokes the clause excluding coverage for "reservations or exceptions in patents."  The second exception in Schedule B under which defendant seeks dismissal is a special exception found in paragraph 9:

> This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of . . . [a]ny loss or damage occasioned by the fact that a portion of subject property lies within the boundaries of patented mining claims, except patented lodes and millsites insured hereunder.

Pl.'s Resp. at 20.

### C.  Procedural Background

Mr. Fatell filed a Complaint against Stewart Title on or around October 17, 2008 in the district court for Denver County, Colorado.  In his Complaint, Mr. Fatell asserts four claims against Stewart Title in connection with its denial of coverage: breach of contract, negligence, bad faith denial of an insurance claim, and violation of the Colorado Consumer Protection Act.  On November 19, 2008, Stewart Title removed the case to this Court on diversity grounds  [Docket No. 1].  On that same day, Stewart Title filed a motion to dismiss, seeking dismissal of each of Mr. Fatell's four claims under Federal Rule of Civil Procedure 12(b)(6).  *See* Stewart Title's Mot. to Dismiss [Docket No. 3] ("Def.'s Mot. to Dismiss").  On January 9, 2009, Mr. Fatell responded.  *See* Pl.'s Resp.  On January 26, 2009, Stewart Title filed a reply in support of its motion to dismiss.  *See* Stewart Title's Reply in Supp. of Mot. to Dismiss [Docket No. 19] ("Def.'s Reply").  Defendant's motion to dismiss, therefore, is fully briefed and ripe for disposition.

## II. ANALYSIS

### A. Federal Rule of Civil Procedure 12(b)(6)

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For a complaint to state a claim it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual matter that, taken as true, makes his "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). At the same time, however, a court need not accept conclusory allegations. *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erikson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (omission marks omitted). The "plausibility" standard requires that relief must plausibly

follow from the facts alleged, not that the facts themselves be plausible.  *Bryson*, 534 F.3d at 1286.

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alteration marks omitted).

### B.  First Claim for Relief – Breach of Contract

In his Complaint, Mr. Fatell alleges that by denying his title insurance claim for losses incurred in connection with Lot 14, Stewart Title breached the Title Policy. Stewart Title contends that Mr. Fatell's breach of contract claim should be dismissed as a matter of law under Rule 12(b)(6) because the plain language of the Title Policy allegedly does not apply to Mr. Fatell's losses.  According to Stewart Title, paragraphs 5 and 9 of the list of exceptions in Schedule B place Mr. Fatell's losses beyond the scope of the Title Policy's coverage.  *See* Def.'s Mot. to Dismiss at 4.

### *1. Legal Standard – Interpretation of Insurance Policies*

Under Colorado law, courts interpret insurance policies using the same principles employed in contract interpretation.[6]  *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995); *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). Interpretation of the terms of an insurance policy, as with any contract, is a question of law to be decided by the court.  *See Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 (Colo. 2004); *see also In re Aramark Leisure Servs.*, 523 F.3d 1169, 1176 (10th Cir. 2008).

In interpreting an insurance policy, unless the language is ambiguous, courts are to give effect to the intent and reasonable expectations of the parties and to enforce the policy's plain language.  *Hoang*, 149 P.3d at 801.  "When faced with terms in an insurance policy that are not defined, Colorado law dictates that such terms be given their plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance."  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 306 (Colo. 2003) (alteration marks omitted).

The initial question in construing an insurance policy – whether the policy terms are ambiguous – also is decided as a matter of law.  *See State Farm Mut. Auto. Ins. Co. v. Mendiola*, 865 P.2d 909, 912 (Colo. App. 1993).  Such terms are ambiguous if they

---

[6] Where a court has diversity-based jurisdiction over a case, the substantive law of the forum state governs the analysis of the underlying claims.  *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).  With no indication or argument otherwise, I apply the substantive law of Colorado in this case.  In fact, because the parties' briefs assume applicability of Colorado law by citing primarily to it, I operate under that same assumption.  *See, e.g., Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

are susceptible to more than one reasonable interpretation. *Hoang*, 149 P.3d at 801. In making the ambiguity determination, courts are to view the policy as a whole, using the generally accepted meaning of the words employed. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1060 (Colo. 2005). Courts "may consider extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract." *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). However, courts may not consider extrinsic expressions of intent by the parties. *Id.* Furthermore, the mere fact that the parties disagree about the meaning of a provision does not in itself mean the term is ambiguous. *Snipes v. Am. Family Mut. Ins. Co.*, 134 P.3d 556, 558 (Colo. App. 2006).

Any ambiguities in an insurance policy that a court may encounter are to be construed against the insurer, as the drafter of the policy. *See State Farm Mut. Auto Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993). "However, this rule of construction against the insurer cannot be applied where the language is unambiguous and there is nothing to construe." *First Fin. Ins. Co. v. Albertson's, Inc.*, 91 P.3d 470, 472 (Colo. App. 2004) (citing *Jorgensen v. St. Paul Fire & Marine Ins. Co.*, 408 P.2d 66, 68 (Colo. 1965)).

### *2. Paragraph 5 of Schedule B*

According to the general exception in paragraph 5 of Schedule B, the Title Policy "does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of . . . [u]npatented mining claims; reservations or exceptions in patents, or an act authorizing the issuance thereof; water

rights, claims or title to water." Pl.'s Resp. at 20.  Stewart Title believes that the clause excepting losses which arise by reason of "reservations or exceptions in patents" excludes Mr. Fatell's losses from the Title Policy's coverage.  In construing paragraph 5, the Court turns first to the question of whether the language is ambiguous.  In determining the ambiguity question, evidence of custom and usage and of the circumstances surrounding the making of the contract are particularly instructive.

Paragraph 5 employs terms of art from the law of property.  A "patent" is a governmental grant of a right, privilege, or authority, or the official document making such a grant.  *See* Merriam-Webster's Collegiate Dictionary 907 (11th ed. 2007); Black's Law Dictionary 1156 (8th ed. 2004).  The type of patent which conveys land is known as a "land patent," which esssentially amounts to a deed from a government entity to a private party.  *See* Black's Law Dictionary 1156 (8th ed. 2004) (defining a "land patent" as "[a]n instrument by which the government conveys a grant of public land to a private person"); *see also* Merriam-Webster's Collegiate Dictionary 907 (11th ed. 2007).

Traditionally, an "exception" to a land patent or deed was understood to be "some part of the property not included in the conveyance and with which the grantor never parts." *O'Brien v. Vill. Land Co.*, 794 P.2d 246, 250 (Colo. 1990); *see also* Black's Law Dictionary 604 (8th ed. 2004).  As Powell's treatise on property explains, an exception "means that some *physical* part of the grantor's real estate has not been parted with." 1-81A Powell on Real Property Michael Allan Wolf Desk Ed. § 81A.05[3][h][ii] (2009) (emphasis added).  An illustration of this concept in Powell proves educative in the present case, "an exception of the eastern one-half of a particular

parcel of land prevents the conveyance of any interest in the eastern parcel; the conveyance transfers only the western one-half." 1-81A Powell on Real Property Michael Allan Wolf Desk Ed. § 81A.05[3][h][ii] (2009). Therefore, where the owner of a parcel of property conveys a portion and withholds a portion of that parcel, that owner is said to be creating an exception to the conveyance.

A "reservation," on the other hand, is "the creation in the grantor of a new right or interest in the premises conveyed . . . ." *O'Brien*, 794 P.2d at 250; *see also* Black's Law Dictionary 1333 (8th ed. 2004). Generally, "[a] 'reservation' does not affect the basic conveyance of the real estate in question, but instead reserves or recreates in the grantor some special interest in the land conveyed." 1-81A Powell on Real Property Michael Allan Wolf Desk Ed. § 81A.05[3][h][ii] (2009). In other words, a "reservation" is a technique by which a transferor of a defined parcel of property conveys something less than an estate in fee simple absolute in the entire parcel by removing one of the sticks – e.g., water rights, mineral rights, easements, etc. – from the bundle of property rights transferred.

Colorado courts have not been strict in maintaining the technical distinction between "exceptions" and "reservations," and instead focus on the intent of the parties. *See*, *e.g.*, *O'Brien*, 794 P.2d at 250 ("[T]he historical distinction is without significance when the deed itself unambiguously manifests the intent of the parties."). However, these cases, in broadening its scope, do not divest the term "exception" of its historical meaning, or make it ambiguous. Instead, the definition of "exception" now encompasses both exceptions in the traditional sense of the withholding of a fee simple

interest in a portion of property and the more modern adaptation in which an owner excepts something less than a fee simple interest.

This interpretation of the term "exception" in paragraph 5 is also reasonable in light of the circumstances surrounding Lot 14. The property is located in a mountainous area of the western United States where title can be difficult to trace and can be affected by a variety of public and private interests. Government patents can be old, illegible, and difficult to apply to the land in question. Add to this the complication of governments' distribution of fractured interests in property and the difficulty in clearing title against a government owner,[7] and it becomes reasonable to interpret paragraph 5 as an attempt to limit liability from the uncertainties surrounding title in such land.

As further evidence of the context in which the Title Policy was formed, I note that the policy contains an endorsement deleting the first four exceptions of Schedule B. Therefore, there is at least some indication that the process was fluid and considered and the terms negotiated.

Therefore, I conclude that paragraph 5's language excepting coverage for losses arising by reason of "reservations or exceptions in patents" is susceptible to only one reasonable interpretation: to wit, the Title Policy does not cover the policyholder's losses and damages which result from a land patent's withholding of some interest from the larger property held by the transferor. That interest may be the whole of some geographical division of the property or some separable right in the portion conveyed

---

[7] For example, adverse possession or other prescriptive remedies generally are not available against the government. *See United States v. Osterlund*, 505 F. Supp. 165 (D. Colo. 1981), *aff'd*, 671 F.2d 1267 (10th. Cir. 1982); *Omaha & Grant Smelting & Refining Co. v. Tabor*, 21 P. 925 (Colo. 1889).

such as mineral rights, easements, or water rights. Because these terms would be unambiguous to the average purchaser of title insurance, I apply their plain and ordinary meanings here.

The exception of the Cape Verde Claim from the Dolores Patent was a classic example of an exception in a land grant. The United States, as owner of the entirety of the property encompassed by the Dolores Placer Mining Claim and the Cape Verde Claim, conveyed its interest to Mr. Fatell's predecessor. However, it expressly excepted the portion described as the Cape Verde Claim and, in fact, used that very term: "Expressly *excepting* and excluding from as stated presents that portion of the ground herein before described, embraced as in said Cape Verd . . . lode claim[ ] . . . ."[8] Pl.'s Resp. at 23 (emphasis added). Mr. Fatell himself explains that the Dolores Patent "expressly excepts and excludes" the Cape Verde Claim and also describes the Cape Verde Claim as a "reservation." Compl. ¶¶ 23, 25. Therefore, by the terms of the Dolores Patent and the Complaint, Mr. Fatell's losses fall within the scope of paragraph 5's exception for "reservations or exceptions in patents."

Given my conclusion that the exception of the Cape Verde Claim from the Dolores Patent qualifies as a "reservation or exception in a patent," I turn to the question of whether paragraph 5's causation element – that the losses or damages "arise by reason of" the identified exception – is satisfied. Here, the analysis is straightforward. Mr. Fatell's losses were proximately caused by the fact that a portion of Lot 14 lies within the Cape Verde Claim. Thus, his losses "arose by reason" of the exception in a

---

[8] This language represents the Court's best effort at deciphering the language of the Dolores Patent in line with Mr. Fatell's averments in his Complaint.

patent and are excepted from coverage under the Title Policy by paragraph 5 of Schedule B.

As a further obstacle to Mr. Fatell's recovery, all indications under Colorado law suggest that for a title insurer to be liable to an insured under contract law, there must be an express or implied contractual provision providing as much. *See Arapahoe Land Title, Inc. v. Contract Fin., Ltd.*, 472 P.2d 754, 756 (Colo. App. 1970). Where title defects are specifically and effectively exempted from coverage by a title insurance policy, no Colorado case has found that an express contractual provision creates liability in a title insurer. *See, e.g., Arapahoe Land Title*, 472 P.2d at 756-57; *Balkind v. Telluride Mountain Title Co.*, 8 P.3d 581, 587 (Colo. App. 2000).

The specificity of the exception appears to bear heavily on its impact. *See Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991) ("Exclusionary clauses designed to insulate particular conduct from general liability coverage provisions must be drafted in clear and specific language."); *Hedgecock v. Stewart Title Guar. Co.*, 676 P.2d 1208, 1210 (Colo. App. 1983) (holding insurer liable where exception in coverage tracked, but failed to specifically address, the defects in question); Joyce Palomar, Title Insurance Law § 7:17 (2008) ("[I]f a lien, encumbrance or other title defect is to be excepted from coverage, the title insurer must use clear, precise and unambiguous language in the exception."). The Colorado Court of Appeals also has viewed the existence of an applicable exception in a title policy as undercutting the existence of an implied contractual obligation. *See Arapahoe Land Title*, 472 P.2d at 756-57; *see also Balkind*, 8 P.3d at 587.

In the present case, the applicability of the exception in paragraph 5 and the apparent lack of a contrary express contractual term leads the Court to conclude that Mr. Fatell cannot rely on an express contractual obligation to assert a breach of contract claim against Stewart Title.  Nor has Mr. Fatell presented a factual basis upon which the Court could imply a contractual duty on Stewart Title to cover Mr. Fatell's losses.  In fact, in addition to paragraph 5 of Schedule B, the Title Policy contains other provisions that militate against such a finding.  For example, the very first sentence of the Title Policy explains that the Title Policy's coverage is "subject to . . . the exceptions from coverage contained in Schedule B . . . ."  Pl.'s Resp. at 14.  The Title Policy also contains a merger clause which reads: "This policy together with all endorsements, if any, attached hereto by [Stewart Title] is the entire policy and contract between the insured and [Stewart Title]."  Pl.'s Resp. at 15.  Therefore, I conclude that Mr. Fatell has failed to state a claim for the breach of an express or implied contractual provision and that paragraph 5 of Schedule B requires the Court to dismiss Mr. Fatell's breach of contract claim against Stewart Title.[9]

### C.  Second Claim for Relief – Negligence

In his Complaint, Mr. Fatell claims that Stewart Title owed him a duty of care to properly research all recorded documents in the chain of title for Lot 14, including the Dolores Patent.  Mr. Fatell further asserts that Stewart Title was negligent in failing to properly inspect these documents, with said failure proximately causing his damages.

---

[9] Because paragraph 5 is dispositive on the issue of the breach of contract claim's viability, I do not undertake a discussion regarding the meaning and effect of paragraph 9 of Schedule B.

Stewart Title urges the Court to dismiss Mr. Fatell's negligence claim for a failure to cite a cognizable duty which Stewart Title owed Mr. Fatell.

There appears to be no clear rule in Colorado or elsewhere regarding the tort duties of title insurers. *See* Joyce Palomar, Title Insurance Law § 12:3 (2008). This Court, sitting in diversity jurisdiction, approaches unanswered questions of state law as it believes the state Supreme Court would. *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir.1994) ("If a federal court cannot ascertain the law of the forum state, we must in essence sit as a state court and predict how the highest state court would rule."). Furthermore, "[a]lthough we are not required to follow the dictates of an intermediate state appellate court, we may view such a decision as persuasive as to how the state supreme court might rule." *Sellers v. Allstate Ins. Co.*, 82 F.3d 350, 352 (10th Cir. 1996).

With no ruling from the Colorado Supreme Court on the issue of inferred duties of a title insurer, this Court looks to opinions from the Colorado Court of Appeals. As mentioned above, that court has said that items specifically and effectively exempted from coverage by a title policy cannot be the source of a duty in contract or in tort. *See Arapahoe Land Title, Inc. v. Contract Fin., Ltd.*, 472 P.2d 754, 756-57 (Colo. App. 1970). And where there is no duty, there can be no negligence. *See Arapahoe Land Title*, 472 P.2d at 756.

In the present case, the terms of the Title Policy specifically except Mr. Fatell's losses from coverage. Therefore, Mr. Fatell may not circumvent those limits by asserting a claim in negligence, *see Arapahoe Land Title*, 472 P.2d at 756, and the

Court must dismiss the negligence claim for failure to state a claim for which relief can plausibly be granted.

Because the Court decides this case on existing legal principles, the Court does not engage in the exercise urged by Mr. Fatell of determining whether title insurers have an independent duty to search the chain of title of a subject property. Therefore, the Court does not undertake an analysis regarding the establishment of a common law duty, *see Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987), or a duty based on statutory proclamations, *see Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913 (Colo. 1997).

### D.  Third Claim for Relief – Bad Faith Denial of Insurance Claim

Defendant Stewart Title argues that Mr. Fatell's bad faith claim necessarily fails because his breach of contract claim fails. I agree. *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage."). Therefore, because the Court dismisses plaintiff's breach of contract claim as a matter of law, the Court also dismisses plaintiff's bad faith claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

### E.  Fourth Claim for Relief – Violation of Colorado Consumer Protection Act

Under Colorado law, "an insured, like any other consumer, may seek compensation for damages as a result of post-sale deceptive practices by an insurance company under the provisions of the [Colorado Consumer Protection Act ('CCPA')]." *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 59 (Colo. 2001).

However, to prove a private cause of action under the CCPA, a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).

As a consequence of the third element listed above, "[t]he CCPA can not be used to remedy a purely private wrong." *Crowe v. Tull*, 126 P.3d 196, 208 (Colo. 2006). Moreover, a plaintiff's failure under the CCPA to properly allege a public impact is grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6). *See NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1137 (D. Colo. 2007).

Mr. Fatell's Complaint presents no allegation of or factual support for a public impact due to Stewart Title's alleged unfair trade practices. Therefore, the Court need not delve any further into this claim. *See Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) ("[A] complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." (alteration marks omitted)). Therefore, Mr. Fatell's fourth claim for relief – violations of the Colorado Consumer Protection Act – also is dismissed for failure to state a claim.

### III.  CONCLUSION

Pursuant to the discussion herein, it is

**ORDERED** that defendant Stewart Title Guarantee Company's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [Docket No. 3] is GRANTED due to plaintiff Frederic Fatell's failure to state a claim.  Plaintiff Frederic Fatell's claims are dismissed with prejudice.  It is further

**ORDERED** that the clerk shall forthwith enter judgment in favor of defendant Stewart Title and against plaintiff Frederic Fatell.  Defendant Stewart Title may have its costs by filing a bill of costs within eleven days of the date of this order.

DATED September 24, 2009.

BY THE COURT:

s/ Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge